Deposition of Sheriff Jim Johnson, taken March 30, 2022

Page 1

1       IN THE UNITED STATES DISTRICT COURT FOR THE
             NORTHERN DISTRICT OF MISSISSIPPI
2                   ABERDEEN DIVISION

3

HAVANA MARIA WADE                          PLAINTIFF
4
VS.                          NO. 1:21CV98-DMB-DAS
5
LEE COUNTY, MISSISSIPPI                     DEFENDANT
6

7

8
       **********************************************************
9
             DEPOSITION OF SHERIFF JIM JOHNSON
10
       **********************************************************
11

12

13
          TAKEN AT THE INSTANCE OF THE PLAINTIFF
14     IN THE LAW OFFICES OF MITCHELL, McNUTT & SAMS, P.A.
          105 SOUTH FRONT STREET, TUPELO, MISSISSIPPI
15          ON MARCH 30, 2022, BEGINNING AT 10:07 A.M.

16

17

18                APPEARANCES NOTED HEREIN

19

20

21

Reported by:  REGINA D. RUSSELL, RPR, CCR 1110
22       _____
23                ADVANCED COURT REPORTING
                       P.O. BOX 761
24                 TUPELO, MS 38802-0761
                    (662) 690-1500
25

EXHIBIT
J

ADV...                    ...G

Deposition of Sheriff Jim Johnson, taken March 30, 2022

Page 2

```
 1
        APPEARANCES:
 2
        For the Plaintiff:
 3
 4              JIM WAIDE, ESQUIRE
                Waide & Associates, P.A.
 5              Post Office Box 1357
                Tupelo, MS  38802
 6              (662) 842-7324
                (waide@waidelaw.com)
 7
 8      For the Defendant:
 9
                MARGARET SAMS GRATZ, ESQUIRE
10              Mitchell, McNutt & Sams, P.A.
                Post Office Box 7120
11              Tupelo, MS  38802-7120
                (662) 842-3871
12              (mgratz@mitchellmcnutt.com)
13
                GARY L. CARNATHAN, ESQUIRE
14              Carnathan Law Office
                Post Office Drawer 70
15              Tupelo, MS  38802-0070
                (662) 842-3321
16              (carnathanlaw@redmagnet.com)
17
18      Also Present:
19
                HAVANA MARIA WADE
20
21
22
23
24
25
```

Deposition of Sheriff Jim Johnson, taken March 30, 2022

```
1                        TABLE OF CONTENTS

2

3    WITNESS                                        PAGE

4    SHERIFF JIM JOHNSON

5         Examination by Mr. Waide...............     5

6

7

8    EXHIBITS

9    NUMBER        DESCRIPTION                       PAGE

10       1    Warrant...........................     27

11       2    Criminal Affidavit................     32

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Sheriff Jim Johnson, taken March 30, 2022

STIPULATIONS

1.  It is hereby stipulated by and between counsel that the deposition of SHERIFF JIM JOHNSON may be taken on behalf of the Plaintiff at the time and place set forth herein and be reported by Regina D. Russell, RPR, CCR 1110.

2.  That all objections as to the notice of the time and place of the taking of this deposition are hereby waived.

3.  That all objections except as to the form of the questions are reserved until the time of the trial.

4.  That the reading of the testimony to or by the witness and signing thereof by the witness are not hereby expressly waived.

Deposition of Sheriff Jim Johnson, taken March 30, 2022

1            SHERIFF JIM JOHNSON, after being

2   duly sworn, testified as follows:

3                      EXAMINATION

4   BY MR. WAIDE:

5       Q.   You're Sheriff Jim Johnson?

6       A.   That's correct.

7       Q.   You're Sheriff Jim Johnson.  And you're the

8   ultimate authority in charge of the Lee County jail?

9       A.   That's correct.

10      Q.   Sheriff, I'm going to ask you the same

11  question I asked your jail administrator, and listen

12  to my question carefully if you would.  In your

13  opinion, is there adequate space at the Lee County

14  jail to afford humane, safe living conditions to the

15  prisoners that are afforded there -- that are

16  imprisoned there?

17              MS. GRATZ:  Object to the form.  You

18  may answer.

19      A.   Adequate space, yes, I feel like there is.

20      Q.   (Mr. Waide)  All right.  Is there -- are

21  you familiar with the holding area where Havana Wade

22  was held when she was there?  Are you familiar with

23  that area?

24      A.   I'm familiar with the holding area that's

25  located inside the jail facility.  There are several

Deposition of Sheriff Jim Johnson, taken March 30, 2022

1  different holding rooms.

2              MR. WAIDE:  What number did he say

3  this one was?

4              MS. WADE:  I can't remember what

5  number.  Three, wasn't it?

6       Q.   (Mr. Waide)  It was three, I believe, said

7  it was holding area three.  Are you familiar with

8  holding area three?

9       A.   Yes.

10      Q.   And what -- are pretrial detainees held in

11  that holding area three?

12      A.   Anyone that's brought into our facility for

13  whatever reason is subject to be held in one of those

14  holding facilities.  Now, one of them is deemed for

15  women, one of them is deemed for men, and that

16  changes based upon the numbers.  So that would be an

17  area that someone would be held when they're brought

18  into our facility or they are brought from the back

19  being taken out of our facility and there's some time

20  that's being lapsed before they leave, that is one of

21  the areas that it would be held.

22      Q.   All right.  Let me get this question, then

23  I'll get to the details of that in a minute.  In your

24  opinion, is there adequate space in holding area

25  three to afford humane, safe living conditions for

Deposition of Sheriff Jim Johnson, taken March 30, 2022

1    the persons that are imprisoned there?

2              MS. GRATZ:  Object to the form.  You

3    may answer.

4         A.   Yes, there is adequate space.

5         Q.   (Mr. Waide)  First of all, are you familiar

6    with the area I'm talking about, which the jail

7    administrator referred to as holding area three?  Do

8    you know where I'm talking about?

9         A.   Yes, sir.

10        Q.   All right.  Can you describe physically

11   what that consists of?

12        A.    It is basically a square room that has

13   benches available to sit down, concrete floor,

14   concrete wall, concrete roof.  It has -- the best of

15   my knowledge, it has a lavatory, which consists of a

16   commode and a sink.

17        Q.   When you say benches, are you talking about

18   benches along the sides, along the walls?

19        A.   Yes, sir.  They're stationary along the

20   outer wall and they're bolted -- I'm sorry.

21        Q.   I'm sorry.

22        A.   They're bolted to the wall where they can't

23   be moved.

24        Q.   And what are they made out of?

25        A.   Best of my recollection, they're steel or

Deposition of Sheriff Jim Johnson, taken March 30, 2022

1    some type of metal.

2         Q.    So what is the procedure for sleeping for

3    the inmates or the people that are being held in

4    those holding areas?

5         A.    Either the floor, the bench or there are

6    portable, we call them portable beds, they look like

7    plastic boats, that have mattresses that can be

8    brought in and brought out.  Now, that's at the

9    discretion of the staff.

10         Q.    The discretion of the staff can bring in --

11    describe them for me again.  You said mattresses at

12    one point.

13         A.    It is a plastic container that looks like a

14    plastic boat, if I was just describing it.

15         Q.    All right.

16         A.    There are rollup mats and blankets that are

17    available throughout the facility to use wherever

18    they need them, and that's one particular area that

19    they could if they felt like they were necessary to

20    be used.

21         Q.    And that's just left up to the discretion

22    of the staff as to whether to bring them in?

23         A.    That's correct.  Well, discretion of the

24    staff and the availability of the --

25         Q.    You mean having enough of them?

Deposition of Sheriff Jim Johnson, taken March 30, 2022

1     A.    That's correct.

2     Q.    All right.  When you talk about -- are

3 there actual -- do they consist of a mattress like

4 we'd have a mattress that you sleep on at night?  Is

5 that what you're talking about?

6     A.    No.  Any mattress -- all the mattresses are

7 the same, whether it's there or whether it's in the

8 housing unit in the back.  It's just a plastic,

9 waterproof thin mat, much like you would remember in

10 day school, a sleeping mat.

11     Q.    I see.  Okay.  And how many of those are

12 available at the jail?

13     A.    That I have no idea.

14     Q.    You don't know?

15     A.    No, sir.

16     Q.    So do you know whether enough of them --

17 assuming the staff, in their discretion, wanted to

18 use these mats, do you know whether there are enough

19 of them in holding area three to accommodate all of

20 the people that would be there?  Do you know whether

21 there are enough to where everybody would have one to

22 sleep on?

23           MS. GRATZ:  Object to the form.

24     A.    I would not know how many is available for

25 any particular time, I just know that they are there.

Page 10

1    Q.   (Mr. Waide)  All right.  Are they used

2    throughout the jail, not only in that holding area

3    but, say, in the regular -- is it just the holding

4    areas they are used in or are they used in other

5    areas of the jail?

6    A.   They are used anywhere in the jail facility

7    that inmates sleep, whether it be in the holding

8    cell, whether it be in the housing unit, where there

9    are not enough actual bunks that are designed for

10   sleeping, they can be used in there.  They're

11   portable.  They can be used anywhere in the facility

12   that they need to be used.

13   Q.   Do you know -- I assume that you've looked

14   into, to some extent at least, of Havana Wade's suit

15   since she filed it, you've looked at the complaint

16   and checked into it some, I would assume, or have

17   you?

18   A.   To some degree, yes.

19   Q.   Some degree.  All right.  Do you recall

20   during the time when she was confined down there a

21   man named James Logan talking to you personally about

22   her and what her situation was?

23   A.   I don't.  I don't recall it.  I mean, I get

24   hundreds of thousands of calls due to this and I

25   don't personally remember a call being made.

Deposition of Sheriff Jim Johnson, taken March 30, 2022

1      Q.    Or talking -- sometimes you're over at the
2   jail?
3      A.    That's correct.
4      Q.    You don't remember a man coming in and
5   asking you about checking on her?
6      A.    I don't personally remember.  I'm not going
7   to dispute it didn't happen, but I don't personally
8   remember it.
9      Q.    All right.  She was arrested -- from your
10  checking into this, do you understand she was
11  arrested apparently on an outstanding warrant for a
12  drug offense, apparently that's the reason she was
13  arrested?  Is that what you understand?
14     A.    That's my understanding.
15     Q.    So from the paperwork you've seen,
16  apparently she did not -- she had not seen a judge
17  when she was arrested and did not see one while she
18  was in jail; is that your understanding?
19     A.    It's my understanding that she was arrested
20  when she came into our facility based upon a felony
21  warrant, and then she was taken before a judge later
22  and a bond was set and she posted bond and got out is
23  my understanding.
24     Q.    Okay.  Sheriff, I'm not -- I'm just telling
25  you this for your information, and I know you just

Deposition of Sheriff Jim Johnson, taken March 30, 2022

Page 12

1    know what you've heard, so this is not a criticism,

2    but I don't think what you just said is correct.

3         A.   Okay.

4         Q.   But I'm not --

5              MS. GRATZ:   There was a waiver of

6    initial appearance.

7         Q.   (Mr. Waide)  I don't think she ever saw a

8    judge, but I know you may have heard different

9    things.  So I'm going to more or less ask you about

10   procedures.

11        A.   Okay.

12        Q.   If a person like her is arrested on a

13   warrant, a felony warrant, what is the procedure for

14   when that person is supposed to see a judge, or is

15   there a procedure about that?

16        A.   In a reasonable amount of time.

17        Q.   All right.  Have you -- I guess the person

18   ultimately that you would deal with at the jail would

19   be the jailer, the chief administrator, Mr. Partlow,

20   wouldn't it?  Would that be right?

21        A.   That's who I would contact.

22        Q.   Is that the only instruction you've given

23   him is that he should see -- that a person should see

24   a judge within a reasonable amount of time?

25              MS. GRATZ:   Object to the form.

Deposition of Sheriff Jim Johnson, taken March 30, 2022

1    A.    Yes.

2    Q.    (Mr. Waide)  Okay.  Now, is it the practice

3  that prisoners do not have contact with a judge over

4  the weekend, that is, on Saturdays and Sundays; is

5  that the practice?

6         MS. GRATZ:  Object to the form.

7    A.    It would depend upon the availability of

8  the judge.  There are some cases where a situation

9  where an individual may be brought in that a judge is

10  aware of and the judge may contact the jail and some

11  arrangement may be made.  But on an average

12  day-to-day practice, if an individual is brought in

13  for a felony warrant when the judge is in his office

14  the next working day and in a reasonable amount of

15  time we either contact the judge for a waiver of

16  initial or we either take them over for the judge to

17  see.

18    Q.    So -- and I think you just answered this.

19  Let me make clear about it.  The practice is that

20  they will see the judge during the judge's normal

21  working hours, which would be Monday through Friday.

22    A.    When the judge is available.  That's

23  correct.

24    Q.    And when he's available.  Are they not

25  available continuously Monday through Friday?

1    A.    You'd have to ask the judge that.  They set
2  their hours.
3    Q.    I'm not trying to argue with you.  Do you
4  know whether they're available on a regular --
5  regularly from Monday through Friday from 8:00 to
6  5:00?  Do you know whether they are available?
7              MS. GRATZ:   I object to the form, but
8  go ahead.
9    A.    There is usually a judge there Monday
10  through Friday from 8:00 to 5:00 at justice court.
11    Q.    (Mr. Waide)  Have you given any
12  instructions on which judge?  Is it just so long as
13  there's some judge available they should contact him
14  at a reasonable time?
15    A.    There has been no instruction of contacting
16  a particular judge, no.
17    Q.    I understand.  But is it just in general
18  just that -- your instructions are to see a judge
19  within a reasonable time during normal working hours
20  from 8:00 to 5:00; is that a fair statement?
21    A.    It is a fair statement to say that you are
22  to have a bond set or have a judge set a bond or take
23  them before a judge at a reasonable time.  Now,
24  that's a lot of discretion for that officer.  And you
25  have a lot of situations where you have a person that

Deposition of Sheriff Jim Johnson, taken March 30, 2022

Page 15

1    is incarcerated that has a case agent that is working

2    a case, where you have an individual that is assigned

3    to that case, and those detention officers are taking

4    a lot of directions from that particular case agent

5    of when to allow them to go get a bond, when to take

6    them over, they are available to go over and discuss

7    the case with a judge.  And that could have a bearing

8    upon when they go.  It's not just a set thing that I

9    set.  There's a lot of discretion in investigators

10   working cases of when to take them over, narcotics

11   agents of when to take them over, things of that

12   nature.  So it would depend upon a particular case.

13   There's not a guaranteed way that you do it every

14   time.

15        Q.    All right.  Have you found the justice

16   court judges in Lee County to be accessible to you?

17   That is, can you call them on their cell phone and

18   talk to them even on weekends?  I'm talking about you

19   yourself.

20        A.    Me personally?

21        Q.    Yes, sir.

22        A.    Yes.  I usually can get ahold of them if I

23   need to, yes.

24        Q.    Have you ever asked the judges whether they

25   would be willing to set bonds by telephone or however

Page 16

1  they want to do it over the weekends?  Have you ever

2  talked to them about that?

3      A.   Just in general or on a particular case?

4      Q.   Either way.  No, I'm not referring to any

5  particular case.  Have you ever talked to them about,

6  given the fact we're in the middle of COVID, jail is

7  heavily populated, have you talked to them about

8  whether they would be willing to set bonds on the

9  weekends?

10     A.   I have never talked to a judge or discussed

11  with a judge about a general practice of could y'all

12  set bonds on the weekend.  No, I have not had a

13  conversation of that nature.

14     Q.   So you don't know whether -- is it fair to

15  say you don't know whether they would be willing to

16  do that or not?

17     A.   I couldn't answer that.

18     Q.   All right.  Do you know -- in looking into

19  this case, do you know anything about Ms. Wade?  Do

20  you know anything about her?  My client seated right

21  here?

22     A.   None other than what has been privy to me

23  through this lawsuit, no.

24     Q.   I guess, have you learned or do you

25  understand that she had a serious mental history

Deposition of Sheriff Jim Johnson, taken March 30, 2022

Page 17

1  before this?  Did you understand that?

2      A.   I was not aware of any of this.

3      Q.   Do y'all have any procedures when a person

4  is arrested on a warrant for taking into account

5  their mental history?  Is there any way to take that

6  into account in deciding whether to incarcerate them

7  in jail?

8      A.   There is an evaluation questionnaire when

9  they're brought in for the individual that's being

10  detained to answer.

11      Q.   Okay.  So that should be somewhere in the

12  records somewhere, the questionnaire?

13      A.   Yes.

14      Q.   Do you understand or would you agree with

15  me that you as the sheriff of Lee County, the highest

16  law enforcement officer in Lee County, would have the

17  discretion if you wanted to, even though they haven't

18  seen a judge, if you thought the circumstances

19  warranted to release a person on their own

20  recognizance even though they hadn't seen a judge?

21          MS. GRATZ:  Object to the form.

22      Q.   (Mr. Waide)  Would you have that discretion

23  as a sheriff?

24          MS. GRATZ:  Object to the form.

25      Q.   (Mr. Waide)  Even if they've been arrested?

Deposition of Sheriff Jim Johnson, taken March 30, 2022

```
 1        A.    Prior to the bond?

 2                   MS. GRATZ:  Object to the form.

 3        Q.    (Mr. Waide)  Yes, sir.

 4        A.    Prior to the bond being set?

 5        Q.    Yes, sir.  Even without them seeing a

 6    judge.

 7                   MS. GRATZ:  I object to the form.

 8        A.    I do understand that that power would be

 9    available in a circumstance that needed to be

10    exercised, yes.

11        Q.    (Mr. Waide)  You feel like -- I'm not

12    asking you what the law is.  I can tell you my

13    opinion of what the law is.  I'm just asking your

14    opinion.  You believe you have that opinion as the

15    sheriff of Lee County to release somebody on their

16    own recognizance even if they haven't seen a judge?

17                   MS. GRATZ:  Object to the form.

18        A.    Prior to a bond being set, yes.

19        Q.    (Mr. Waide)  Yes, sir.  Okay.  All right.

20    I take it -- I understand -- this is just my

21    understanding, that you have from time to time

22    exercised that authority and released people on their

23    own recognizance prior to seeing a judge, correct?

24        A.    I have not done it without exhausting all

25    means of trying to get a judge and they was at a
```

1    conference and I couldn't get ahold of them or

2    something of that nature.  I have not overruled the

3    judge or the availability of a judge.

4         Q.   No, I'm not saying that.

5         A.   No, I have not done that.

6         Q.   You never have directed that somebody

7    that's been arrested be released if they haven't seen

8    a judge?  That has never happened?

9         A.   Not without a bond being set that I can

10   recall.

11        Q.   Okay.

12        A.   Now, if there's a particular case you're

13   talking about we can look at it.  But I don't --

14        Q.   Well, I really don't want to stir up any

15   controversy by getting into a case.  Let me go on.

16   Do you know of any reason -- of course, you don't

17   know anything right now about her history or her

18   mental condition or whether she's lives in the

19   same -- you know, lives in Lee County, criminal

20   background?  You don't really know anything about Ms.

21   Wade, I take it?

22        A.   No, sir.  I do not.

23        Q.   Assuming she was arrested for a felony

24   warrant -- arrested on a felony warrant.

25        A.   Uh-huh (Indicating yes).

Deposition of Sheriff Jim Johnson, taken March 30, 2022

1      Q.    So far as what you know, except for the
2  fact that she's got a felony warrant and that's the
3  reason for her arrest, do you know of any reason as
4  we sit here today why she could not have been
5  released on her own recognizance, whether by you or
6  whether by a judge immediately upon her being
7  arrested, just except for the fact that she has a
8  felony warrant?
9            MS. GRATZ:   Object to the form.
10     A.    Well, there would need to be a bond set.
11  There has to be a bond amount, and that would be set
12  by a judge.
13     Q.    (Mr. Waide)  Well, by own recognizance, I
14  mean without any financial bond.  It's just the
15  practice that financial bond is required.  But it's
16  not -- I'm asking you whether there's any reason for
17  that.  Why could you just not -- let's assume a
18  person is nonviolent, always lived in the same place,
19  is not likely to flee.  Is their any reason why such
20  a person as that couldn't just be released on her own
21  recognizance, whether by a judge or by you?
22            MS. GRATZ:   Object to the form, but go
23  ahead.
24     A.    I do approve recog bonds, which is a
25  signature bond that does not require any monetary

Page 21

1   amount to be put up.

2       Q.   (Mr. Waide)  All right.

3       A.   But even on those recog bonds, there is a

4   bond amount.

5       Q.   I see.

6       A.   There has been a bond set.

7       Q.   A financial bond.

8       A.   A financial bond is set.  And then once

9   that's done, then I exercise the authority to allow

10  someone to do a signature bond if -- or whatever

11  choice that we make.  But it is still after the fact

12  that a bond is set.

13      Q.   By a judge, you mean?

14      A.   By a judge.  I've never had someone brought

15  in and just automatically release them on a

16  recognizance bond without a judge having a bond

17  amount.

18      Q.   In other words -- in other words, in order

19  to be released they have to -- I guess conceivably it

20  could be done by telephone?  They wouldn't

21  necessarily have to appear before the judge, would

22  they?  Or do they have to appear before the judge?

23      A.   No.  It has been done on the phone before.

24      Q.   Okay.  By signature or recog bond, what

25  you're talking about is they just sign their own

Page 22

1    bond, right?

2         A.    That's correct.

3         Q.    And it still has a financial amount in it?

4         A.    There's a bond amount.  That's correct.

5         Q.    In other words, they just sign their own

6    bond without any sureties?

7         A.    Without posting any money.  That's correct.

8         Q.    And I understand from a previous witness,

9    and you can correct me if I'm wrong about his

10   understanding, but I understand from a previous

11   witness that it has been the practice since COVID for

12   people who are arrested for misdemeanors to be

13   released on their own -- well, he described it as

14   their own recognizance, but I assume what you mean is

15   on these signature bonds where they just sign them

16   themselves.

17        A.    That's correct.  But on all misdemeanors

18   there's already a bond amount set.  There's a chart

19   we go by.  And so that amount is put on the bond.

20   And then once that's done and that bond has been

21   preset, then you're not having to go before a judge,

22   you're not having to contact a judge because the

23   judge has already set this amount.

24        Q.    I see.  It's a set amount.

25        A.    And at that point, yes, I have authorized

Deposition of Sheriff Jim Johnson, taken March 30, 2022

Page 23

1   recog bonds.  That's correct.

2       Q.   But what you refer to as a recog bond

3   though is just a person signing their own bond?

4       A.   That's correct.

5       Q.   What I'm -- we're kind of talking in two

6   different languages here.  What I refer to as a recog

7   bond is where someone just signs what's an agreement

8   to appear, I agree to appear on thus and such date,

9   like a summons in a traffic ticket.

10      A.   And no bond amount or no nothing?

11      Q.   Yeah.  But y'all don't do that?

12      A.   No.  I don't.  I don't know if anybody down

13  there does do it.

14      Q.   I guess my question to you though, Sheriff,

15  is, let's assume we have a citizen who is no

16  indication they would not appear for court, you don't

17  have anything before you like they've ever skipped

18  the country or anything, and they don't have any

19  violent history and they have family connections in

20  the community and whatever.  In other words, you just

21  don't have any evidence that they wouldn't appear.

22  Is there any reason why you could not release

23  somebody like that just on their own recognizance?

24              MS. GRATZ:  Object to the form.

25      Q.   (Mr. Waide)  I mean -- what I mean is, I

Deposition of Sheriff Jim Johnson, taken March 30, 2022

1  hereby sign this paper and I agree to be in justice

2  court on such and such a date and my address is and

3  my contact numbers are thus and so and I promise to

4  appear.  Is there any reason that couldn't be done?

5              MS. GRATZ:  Same objection.

6      A.   And that is somewhat done when a person is

7  not brought to jail.  A traffic ticket.

8      Q.   (Mr. Waide)  Right.

9      A.   I mean, you just write it and hope you come

10  back, a post release for your -- catch someone

11  selling beer to a minor, or whatever the choice may

12  be.  If the officer decides not to bring them to

13  jail, there is somewhat of a situation that you're

14  talking about.  Once they're arrested and brought in

15  and incarcerated, then it is the practice that there

16  be a monetary amount on there.  And then the

17  signature bond that just what you said, this is my

18  land, this is my name, this is my telephone number.

19  Because there is an information sheet that I do get

20  of the address and where to contact them in case this

21  particular individual fails to appear, we have the

22  information to go back and get them.  But once

23  they're arrested and brought in, then there is a

24  monetary amount that's set by a judge.

25      Q.   Right.

1    A.    But, yes, I could do what you said prior to

2 that.  But that would be the two differences.

3    Q.    All right.  But the practice -- the

4 practice -- and we're really talking about a felony

5 case here, a warrant on a felony, an outstanding

6 felony.  In that situation, a judge is going to have

7 to set -- in general, the judge is going to have to

8 set the bond before the person can be released?

9    A.    That's correct.  Because the warrant

10 specifically states to.

11    Q.    Right.  And it won't be -- and under the

12 current practice, there's no practice for attempting

13 to contact the judge over the weekend?

14    A.    I mean, the agent could if the agent that's

15 working the case, if they felt like if they wanted

16 to, they would have that discretion, yes.  They

17 could.

18    Q.    But you as the Sheriff of Lee county don't

19 have any practice of requiring that an attempt be

20 made to contact a judge over the weekend?

21    A.    No.

22    Q.    Our justice court system, we have three

23 justice court judges in Lee County?

24    A.    Four.

25    Q.    Four.  I'm sorry.  Four.  Okay.  From

Page 26

1  reading the complaint, you know that this warrant

2  that Ms. Wade was arrested on was a ten-year-old

3  warrant, I believe a 2010 warrant?

4      A.   I would have to look at it to look at the

5  date.  I'm not going to argue with you.

6      Q.   Okay.  Have you instructed the jailers to

7  give any -- make an investigation as to the validity

8  of the warrant or whether the warrant is still valid

9  when it's that old?

10     A.   Yes.

11          MS. GRATZ:  Object to the form.

12     Q.   (Mr. Waide)  You have?  Tell me about that.

13     A.   Whenever an individual is run for a

14 warrants check, a 10-29 check, we have the capability

15 on our -- at our facility to check it on a computer

16 to see if there was ever a warrant issued for that

17 particular individual.  The safety net for that is,

18 we possess the actual warrant in-house at the

19 sheriff's department.  And so that's what we call a

20 hard copy.  That's the actual original copy or

21 original warrant that a judge signs, whether it be a

22 misdemeanor, a felony, a capias, a chancery hold,

23 whatever it is, we house them in our office.

24     Q.   Okay.  So the hard copy of the warrant was

25 at your office?

Deposition of Sheriff Jim Johnson, taken March 30, 2022

Page 27

1       A.    That's where they're housed at.

2       Q.    What I'm talking about though, that

3  wouldn't disclose whether that warrant has ever been

4  withdrawn, or would it?

5       A.    I'm getting to that.

6       Q.    Okay.  Go ahead.

7       A.    Okay.  So that warrant is housed at our

8  facility.  If that warrant is ever not active, if the

9  judge decides or the case has got a disposition or

10  for whatever reason the judge decides to do something

11  with it, then there's a paper trail that follows that

12  and that warrant will be pulled and sent back over to

13  the justice court.  But as long as that warrant is

14  active and it's on file at our office, then my staff

15  is to look at that as an active warrant.  And so that

16  was -- that's how that protocol is handled.

17       Q.    Okay.  So whether there's -- for example, a

18  warrant -- I thought I had a copy of it.  Let me see

19  if I do.  Here we go.

20            MR. WAIDE:  Make this warrant an

21  exhibit to his deposition if you would.

22            (Exhibit No. 1 -- Warrant -- marked

23  and may be found attached to the back of the

24  transcript.)

25       Q.    (Mr. Waide)  That's going to be Exhibit 1

1  to your deposition.  Do you know whether or not --

2  you may not know, you weren't there.  Do you know

3  whether or not this is the -- Exhibit 1 is the

4  warrant that was on file at your office?

5       A.   Now, that I don't know.

6       Q.   That's what you're talking about though

7  would be on file at your office, that type of

8  document, right?

9       A.   Yes.  This is a copy of what it would look

10 like.

11      Q.   What about an affidavit underlying this

12 warrant, is the affidavit on file at your office or

13 just the warrant?

14      A.   No, it's just the warrant.  The affidavit

15 and all other paperwork is filed in justice court.

16 Yes, that's correct.

17      Q.   Is there any procedure then for checking to

18 make sure there's a valid affidavit on file for the

19 warrant?

20      A.   Not for an affidavit.  As long as that

21 warrant is at our office it's considered valid.  If

22 it's not, justice court contacts us, or whoever

23 issued it will contact us and that warrant will be

24 withdrawn.

25      Q.   Okay.

1    A.    But as long as it's there it's considered

2  active.

3    Q.    All right.  This warrant looks like it was

4  issued in 2010, or 20 years -- or 10 years, a decade

5  before.  Is there any procedure for checking about

6  why there would be -- a warrant would be that old and

7  never been served?

8    A.    They could call to ask justice court.  But,

9  you know, I don't know what procedure was followed on

10  this.  But if that warrant was on file at our office

11  it's considered active.

12    Q.    All right.  As a matter of practice when a

13  warrant like this is issued, is there any attempt to

14  serve the warrant or do you just wait until the

15  person is stopped at a roadblock or -- do y'all have

16  any active procedure for looking for people that

17  warrants have been issued for?

18    A.    In general?

19    Q.    Yes, sir.  In general?

20    A.    We do have a procedure that -- and there

21  are so many variables in this.  If it is a case that

22  an investigator is assigned to and they're actively

23  working it, most of the time they will initiate

24  whatever protocol needs to be to get it served, where

25  the person may be.  They kind of stay on what we call

1  on top of their cases.  If it is a warrant issued

2  because some individual went over to justice court,

3  signed an affidavit and there was a warrant issued

4  and there's no investigation, we have no paperwork,

5  we have no knowledge of it or whatever and that

6  warrant is sent over, then ourselves or a constable

7  has the authority, because they work out of justice

8  court, to go through those and serve them or

9  whatever.  But some of them do sit stagnant and they

10  are found out when we do a background check, when we

11  do a safety checkpoint, when we run a driver's

12  license, when another agency stops them and they run

13  what we called a 10-29 on a traffic stop.  So there's

14  not just one particular way that it is done.

15      Q.   Would it be fair to say if a warrant has

16  sat there for that long, the probability is it's a

17  matter that didn't -- that whatever officer was

18  involved in it, if there was an officer involved in

19  it, didn't see it as any particular urgency?

20            MS. GRATZ:  Object to the form.

21      Q.   (Mr. Waide)  If it sits there for that

22  long?

23            MS. GRATZ:  Same objection.

24      A.   You know, I'm not working the case and I

25  wouldn't be -- I wouldn't feel fair to say why or why

Deposition of Sheriff Jim Johnson, taken March 30, 2022

Page 31

1    it was not served.  That would be more of a question

2    for the officer that's working the case to determine

3    it.  But, I mean, we have warrants that's this age

4    that get served.  This is not the only one.  We have

5    them.  So why it sat there that long and the officer

6    didn't initiate it being served, that would be

7    something they would need to answer.

8         Q.    (Mr. Waide)  We don't know who the officer

9    was because we don't have an affidavit, right?  We

10   don't know who the officer was that caused this to be

11   issued?

12        A.    I don't based on this.

13        Q.    Do you know?

14        A.    Personal knowledge?

15        Q.    Yes.  Have you heard?  Do you know from

16   looking into this case maybe, do you know what

17   officer caused this warrant to be issued?

18        A.    Don't hold me to this.  But, now, my

19   understanding is this case was generated out of North

20   Mississippi Narcotics Unit, which is a combination of

21   several counties, including ours, and several

22   municipalities.  So I'm not familiar with what case

23   agent worked this particular case.  I think I have

24   heard Mr. Harper's name mentioned that may have been

25   a case agent, and I've heard Kevin Warren played some

Page 32

1    part in it.  But, now, that I don't --

2         Q.    Kevin Warren?

3         A.    Uh-huh (Indicating yes).

4         Q.    What agency does he work for?

5         A.    He works for North Mississippi Narcotics.

6    He works for me but he's assigned to North

7    Mississippi Narcotics.

8         Q.    You never have talked to Mr. Warren?

9              MS. GRATZ:  About this case?

10        Q.    (Mr. Waide)  Yeah, about this case?

11        A.    I've not talked to anybody about this case

12   as far as narcotics is concerned.

13             MR. WAIDE:  All right.  Let's mark

14   this as Exhibit 2.

15             (Exhibit No. 2 -- Criminal Affidavit

16   -- marked and may be found attached to the back of

17   the transcript.)

18        Q.    (Mr. Waide)  Exhibit 2 looks to be a

19   computer printout that has information about Ms.

20   Wade, including the nature of offense, it's kind of

21   hard to read, it's down in the middle of the page,

22   possession of controlled substance.  And it was filed

23   in September of 2010.  It looks like it has a

24   disposition date of August 10, 2020.  What -- have

25   you ever seen a document like this before?  Looks

Page 33

```
 1    like a computer printout?

 2         A.    This is strictly factual and part of it is

 3    opinion.  This is not anything that my office

 4    produced.  Opinion-wise, it looks like a printed

 5    screen of something that justice court or one of the

 6    courts printed.  But it's not anything that my office

 7    generated.  And if I was forced to make a guess, I

 8    would say it's a court document of some type that the

 9    court has printed.  I mean, it says at the bottom,

10    Delta Computer Systems.  That's not anything that

11    we --

12         Q.    All right.  You earlier indicated, if I

13    understand your earlier testimony, that in the normal

14    course of things a person who has been arrested will

15    be brought over to the justice court judge in a

16    reasonable time, which would be during the regular

17    working hours Monday through Friday; is that a fair

18    statement?

19         A.    That's fair.

20         Q.    At that point when they make that first

21    appearance, is there a lawyer appointed for the

22    person over there at the justice court?  Do they get

23    a lawyer appointed or do you know?  Don't tell me if

24    you don't know.

25         A.    No, I can answer that.  If it is a felony
```

Page 34

1   case and they are taken over for a judge for an

2   initial appearance --

3          Q.    Right.

4          A.    -- then part of that initial appearance

5   waiver or form that they're looking at, one of the

6   questions is to have an appointed attorney or have

7   you got one that you're going to hire, and that name

8   is placed on that initial appearance at that

9   particular time.

10         Q.    Do you know whether they actually get a

11  lawyer at that time?  Is a lawyer actually appointed?

12  Well, I guess it's put in their paperwork, but

13  whether they actually see the person at that time, do

14  you know?

15         A.    No.  I mean, I've never seen a lawyer jump

16  out of the wall at that time in the room.

17         Q.    They don't call one over there, I take it?

18         A.    No.  It's written on there.

19         Q.    On their paperwork that's their lawyer.

20  And when the lawyer sees them would be pretty much up

21  to the lawyer, I take it, at that point?

22         A.    If it's court appointed.  Now, we have had

23  initial appearances where the individual hired the

24  attorney and the attorney went over there with them.

25  There has been that case.  But if it's appointed then

1  the court appoints it and then it's up to the court

2  to arrange that.

3          Q.   The court or the lawyer?

4          A.   Or the lawyer, correct.

5          Q.   Who are the current court-appointed lawyers

6  in Lee County?

7          A.   Oh, I'm guessing.  I'm strictly guessing.

8  Lori Basham, Will Bristow.  Those are the only two I

9  can think of.  And that changes.  But those were the

10  last two.  It has been a long time since I fooled

11  with that, to be honest, but I think that's who it

12  is.  Adam Pinkard.  Kelly Mims used to be.  He's a

13  judge.

14          Q.   Right.  Well, since you mentioned Kelly

15  Mims, Kelly Mims has a niece named Sherry Mask, I

16  think at one time her name was Sherry Williams, and

17  there was quite a controversy, as I understand, about

18  her being -- she was a nurse that was arrested out at

19  North Mississippi Medical Center and was in the Lee

20  County jail at the same time Ms. Wade was and she was

21  making some complaints about her treatment.  Do you

22  happen to remember her?  Do you know who I'm talking

23  about?  Have any idea who I'm talking about?

24          A.   No.

25          Q.   Okay.  I asked the previous witness this

1    and I need to ask you as well.  As I understand it,

2    if I wanted to get a list of the people who were in

3    jail at the same time Ms. Wade was, I can get that

4    out of the jail docket, the jail docket would

5    disclose that?

6        A.   Yes.  The jail docket would disclose that.

7    You'd have to search for it.

8        Q.   It's maintained by date, isn't it, I

9    assume?

10       A.   It's maintained by date.  It's name, date

11   of birth and charge.

12       Q.   All right.  Is there any record of when

13   they're released kept?  Apart from the jail docket,

14   is there any other record where you could go in and

15   take a particular person and see when that person was

16   released?

17       A.   It's in the jail docket.  And another

18   thing, it's all alphabetized.

19       Q.   The jail docket is alphabetized?

20       A.   By last name.

21       Q.   So you could go to the last name of the

22   people, if you know who was in jail, and then find

23   out when they were put in and when they were

24   released?

25       A.   (Witness nods head affirmatively.)

Page 37

1      Q.    And is it also maintained by date so you

2   can also go to a date and see --

3      A.    Not the docket.  The public docket is not.

4      Q.    What document is there over there that

5   could show us by date?  See, I'd like to know who was

6   in jail at the same time Ms. Wade was.  How can I

7   find that out?

8      A.    There is -- the capability of our system

9   can search by date, by name, by sex.  And I'm pretty

10   certain you could probably put the date in question

11   and have the people that were incarcerated that day.

12   Now, I don't know that it's going to separate who was

13   in holding cell two that day and who was in holding

14   cell three.

15      Q.    I see.

16      A.    I think it's just going to have the

17   availability that these were the people in jail on

18   January 1st of 2020.  I believe that's right.

19      Q.    So you don't think it can be -- who is your

20   computer expert over there that we can talk to?

21      A.    I mean, Captain --

22      Q.    I know it's not Gary Carnathan.  He don't

23   have a cell phone.

24      A.    Captain Partlow would know what the

25   capability of it is.  I know you can do searches for

1  different things as far as knowing the people that

2  were in jail that particular day.  Now, how confined

3  you can make that, if I need to know who's in housing

4  unit A that day, I don't know that it will do that,

5  and it may.  But Captain Partlow would know the

6  answer to that.  But J. C. Aaron is the tech guy for

7  Lee County.  But, now, I don't know -- he doesn't

8  have enough knowledge to know how our system works,

9  because it's an in-house system that we had built to

10  fit our jail, and Captain Partlow was trained on it.

11      Q.   I'm embarrassed to say I've never even

12  looked at the jail docket as long as I've been a

13  lawyer in Lee County.  I've never even looked at it.

14      A.   You should come down and look at it.

15      Q.   I intend to.  I intend to come look at it.

16  Is the jail docket, is it -- I know it's maintain

17  alphabetical by person, but is it also maintained --

18  can you go to a particular date in the jail docket

19  and see who was in jail?

20      A.   (Witness shakes head negatively.)

21      Q.   You can't do that?

22      A.   No.  It is a red docket book that's

23  handwritten every day that you put the name of the

24  person arrested, it has a place for their date of

25  birth, a place for their arrest, and then their

Deposition of Sheriff Jim Johnson, taken March 30, 2022

1  charge and their release date.  And it has got A

2  through Z tabs.  So if you're looking for Jim Waide,

3  you'd look under W, and it would tell you what date

4  that individual was arrested and what the charge was.

5  But, now, you would have to know their last name and

6  then you'd just have to flip back and forth through

7  the book.  It's the way --

8       Q.   You told me something.  I'm asking the same

9  question again.  But you told me there was some -- if

10  I wanted to go down -- how would you go about if you

11  wanted to take -- I want to find out who was in jail

12  the days Ms. Wade was there, say, on July 31st, 2020.

13  How would I go about doing that?  People in the jail

14  in the holding cell with her is what I'm interested

15  in.  There's not any way to do that?

16       A.   For you to do that?

17       Q.   Well, for somebody to do it that has

18  expertise to do it?

19       A.   I would say they would have to file a

20  freedom of information and request a summons or get

21  with the attorney or something to do it.

22       Q.   That's what -- we're kind of squabbling

23  about that now, about how to go about it and what to

24  do.

25       A.   They would have to advise you how to do

Page 40

1    that.

2         Q.    Okay.  You don't know yourself how to get

3    it?

4         A.    All I know is our system has the capability

5    of -- has the capability of doing a search of knowing

6    dates, people's name, things of that nature, at the

7    touch of a computer versus going in that docket

8    manually.

9         Q.    Right.

10        A.    Yeah.  It's like going on a trip with Gary

11   or going on a trip with me, it would be a different

12   trip.

13        Q.    All right.  Sheriff, I guess I need to ask

14   you this, which is kind of overlapping.  I feel like

15   I know that your position is that we need a new jail

16   over there.  I feel like I know that from reading the

17   newspaper.  This is relevant to my case here, so I

18   need to know why.  Why do we need a new jail?  That's

19   your opinion we need a new jail, correct?

20        A.    It is my opinion.

21        Q.    Tell me why that is.

22        A.    Well, anything can be improved, no matter

23   what it is.

24        Q.    Right.

25        A.    As far as the jail is concerned, we opened

Page 41

1    it in 1995, I think, '95 or '97.  I'm losing dates.

2    The laws have changed.  We wrote -- most recent

3    COVID.  There is always room for improvements once

4    you get a place, whether you're building a house and

5    10 years later you realize I wish I'd made the

6    bedroom bigger, I wish I had made the closet bigger.

7    The jail is no different.  There are some things in

8    there that we would like to see improvements on.

9    It's not just my opinion.  There has been three

10   studies done upon the facility.

11        Q.    Do you have those?  Where are those?

12        A.    And things of that nature.

13        Q.    Where are these studies?  Are they on the

14   internet?  Do you have them in your possession?

15        A.    No.  The board of supervisors would have

16   access to that.

17        Q.    Okay.  On whether we need a new jail or the

18   need for a new jail?

19        A.    The study of the jail that could go more in

20   specifics.  The need for -- the purpose of needing a

21   new facility, the reason why they feel that, you

22   know.  It's not just my opinion.  I work in it every

23   day.  When I talk about the jail, it's not just the

24   fact of individuals that are detained.  My office

25   staff -- my briefing room is not big enough for my

Deposition of Sheriff Jim Johnson, taken March 30, 2022

1  staff.  The lobby area, the way it is designed, it

2  doesn't meet the needs of the general public.  And we

3  have, you know, changed things and done the best that

4  we could with what we've got.  But there's just a lot

5  of improvement.  The staff bathroom doesn't work.

6  So, you know, I could sit here and -- but overall, I

7  do support a new facility.

8      Q.   All right.  What I'm interested in is the

9  prisoners.  In your opinion, is there a need for a

10  new -- is your opinion that we need a new jail

11  related in any way to the need for more space and

12  better facilities for the prisoners?

13      A.   There is a need for more space.  Now, you

14  know, we make do with what we have.  With what we

15  have, there is no on that is mistreated.  There is no

16  one that needs are not met to the best way that we

17  can meet them with what we've got.  But there are

18  always ways to improve it.  It would be better if we

19  had -- for instance, if we had showers inside the

20  cells for inmates to use.  But there is a shower

21  available, it's just time-consuming for us to get

22  them out and move them over to this area, get it done

23  and move them back.  The exercise yard is outside

24  where there's no roof.  So if it's raining you got to

25  get wet.  If it's snowing you're going to get cold.

Page 43

```
 1    It would be better if that facility was inside and
 2    climate controlled.  Since COVID come in, you know,
 3    the U. S. Department of Justice, the criminal justice
 4    studied people and everything, helped design the
 5    facility we had in 1995.  If they designed it today
 6    they would do it different.  Because they have went
 7    from that particular facility designed for what you
 8    call dormitory-style housing, where a group of
 9    people, large group of people are in a room all
10    together.  Now they're kind of getting away from that
11    and trying to get segregation to where you can now,
12    because of COVID, because of health issues, that you
13    can segregate this one from this one.  Our facility
14    was not designed to do that.  Our facility was
15    designed for multiple people to be in a room, whether
16    in the housing unit, the holding cell.  There are
17    very few individuals rooms that an individual gets
18    his own cot, his own bed, her own bed.  So for those
19    reasons I support a new facility because there's just
20    different ways that we would be able to meet the
21    needs of -- visitation is all -- you got to bring an
22    inmate out, you got to bring them up, the general
23    public has got to come in.  You know, it would be
24    better to have that designed in a different way.  And
25    we've worked on some of that where we've got audio
```

Page 44

```
1   and video visitation.  But there are just a lot of

2   different improvements.

3        Q.   Y'all maintain use of force reports any

4   time a correctional officer uses force?

5        A.   Yes.

6        Q.   All right.  And those would be accessible

7   by date?

8        A.   That's correct.

9             MR. WAIDE:  All right.  I'm going to

10  need to take a few minutes to talk with her to see if

11  I've got anything else for the sheriff.

12             (Pause in Proceedings.)

13        Q.   (Mr. Waide)  Sheriff, assuming this for the

14  sake of argument -- I'm sure you don't know this.

15  But assuming Ms. Wade was put in jail around noon --

16  arrested around noon on Friday, there's no reason why

17  they couldn't have contacted or called a judge

18  before -- that Friday afternoon to ask about a bond

19  for her, is there?

20             MS. GRATZ:  Object to the form.

21        Q.   (Mr. Waide)  Somebody at the jail couldn't

22  have done that?

23             MS. GRATZ:  Same objection.

24        A.   There's not no reason they couldn't have.

25        Q.   (Mr. Waide)  All right.  Sheriff, I'm
```

Deposition of Sheriff Jim Johnson, taken March 30, 2022

1    not -- all have sinned and come short of the glory of

2    God.  I bet you know that from the Baptist church,

3    don't you?

4         A.   That's the only way I'm getting to Heaven,

5    to accept that.

6         Q.   Well, I tell you that to tell you, I know

7    you're going to say this is just Waide over here

8    trying to embarrass me, and that's not what I'm

9    trying to do.  This is relevant to my case.

10        A.   Okay.

11        Q.   We were talking about recognizance and your

12   ability to do recognizances.  And at one point you

13   said, well, if you can give me a special case.

14        A.   Okay.

15        Q.   So I'm going to give you one.

16        A.   Okay.

17        Q.   The news media reported that you contacted

18   the jail and got a supervisor named Billy Joe Holland

19   out of jail before he had seen a judge.  He was

20   arrested on a DUI.

21        A.   Right.

22        Q.   The news reported this.  Do you remember

23   those?

24        A.   That's correct.

25        Q.   And they quoted you as having said you did

Page 46

1    that.

2          A.    That's correct.

3          Q.    Did you do that?  Is that true?

4          A.    Yes.

5          Q.    Have there been other examples of cases

6    where you've let people -- contacted the jail and let

7    them out before they had seen the judge?

8          A.    No. That case was not the same way.

9          Q.    I'm sorry?

10         A.    That particular case, the Holland case, was

11   not that particular case.  It's not in the variable

12   that you're putting it, as before he saw the judge.

13         Q.    Oh, he had seen the judge?

14         A.    No.  As I said earlier in my statement, if

15   you are brought into our facility and you are charged

16   with a misdemeanor, which Mr. Holland was charged

17   with a misdemeanor, there is bond amount that has

18   already previously been set by a judge.

19         Q.    I see.

20         A.    In that particular case, that amount would

21   have already been there.  And many occasions I will

22   be called at home, contacted some shape, form or

23   fashion and they will say, hey, could I go down and

24   pick so and so up, do you mind if I go on their bond,

25   can I sign their bond, can you release them, whatever

Deposition of Sheriff Jim Johnson, taken March 30, 2022

1    reason.  Then I will contact the jail, as I did --

2    and it's no embarrassment.  I'm not ashamed of what I

3    did -- of Mr. Holland and have them, when they get

4    through with him, then release him on his own

5    recognizance to whoever.  Yes, I did it.  I did it.

6    But there was already -- the bond amount in that case

7    was already set.

8         Q.   So the only difference between him and

9    anybody else arrested for DUI is he didn't sit there

10   for the eight hours.  That would be the only

11   difference?

12        A.   That's correct.

13        Q.   Is everybody who's arrested for a

14   misdemeanor entitled to that procedure to be released

15   by just a signature bond, everybody that has a

16   misdemeanor?

17             MS. GRATZ:  Object to the form.  Go

18   ahead.

19        A.   Yes.  Captain Partlow has got the authority

20   that I've give him the authority that if they are

21   arrested for a misdemeanor and he needs to have them

22   released for whatever reason on a recog bond or

23   property bond, he has the authority to do that.  Now,

24   how many times he has exercised it, that I don't

25   know.  But that is available, yes.  And as you said

1   before the conversation ever started, the paper is

2   not always accurate.

3        Q.    Yeah, I know.  But you've answered

4   accurately as to what happened?

5        A.    That's correct.  That's what happened.

6   Yes.

7        Q.    All right.  I have some other things I

8   could ask but I don't think it serves any purpose.

9                  MR. WAIDE:  That's all I have.

10                 MS. GRATZ:  Okay.  Thank you.

11                 (Deposition concluded at 11:10 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of Sheriff Jim Johnson, taken March 30, 2022

Page 49

```
 1                   C E R T I F I C A T E
 2    STATE OF MISSISSIPPI        )
 3    COUNTY OF LEE               )
 4    RE:   ORAL DEPOSITION OF SHERIFF JIM JOHNSON
 5           I, Regina D. Russell, RPR, CCR 1110, a Notary
 6    Public within and for the aforesaid county and state,
 7    duly commissioned and acting, hereby certify that the
 8    foregoing proceedings were taken before me at the
 9    time and place set forth above; that the statements
10    were written by me in machine shorthand; that the
11    statements were thereafter transcribed by me, or
12    under my direct supervision, by means of
13    computer-aided transcription, constituting a true and
14    correct transcription of the proceedings; and that
15    the witness was by me duly sworn to testify to the
16    truth and nothing but the truth in this cause.
17           I further certify that I am not a relative or
18    employee of any of the parties, or of counsel, nor am
19    I financially or otherwise interested in the outcome
20    of this action.
21           Witness my hand and seal on this 15th day of
22    April, 2022.
23
24
                              _____
25    My Commission Expires:   RPR, CCR 1110
      January 27, 2024         Notary Public
```